UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 8/28/2014
```

------------------------------------------------------------ X

ISMAEL VILLAFANE,                                         :

                            Plaintiff,     :

                                    :

                 -against-        :            12-CV-7988 (VEC)

                                    :

CAROLYN W. COLVIN, Acting Commissioner  :            MEMORANDUM
of Social Security,                                      :            OPINION AND ORDER

                                  :

                        Defendant.[1]  :

------------------------------------------------------------ X

VALERIE CAPRONI, United States District Judge:

       Plaintiff Ismael Villafane brings this action pursuant to Section 205(g) of the Social

Security Act, 42 U.S.C. § 405(g), seeking judicial review of the final determination of the

Commissioner of Social Security (the "Commissioner") denying his application for disability

insurance benefits under the Social Security Act for the four-month period of September through

December 2007.  The parties cross-moved for judgment on the pleadings pursuant to Rule 12(c)

of the Federal Rules of Civil Procedure.

## PROCEDURAL BACKGROUND

       On August 27, 2009, Villafane applied for social security disability benefits.  R. 94.[2]  In

December 2009, the Social Security Administration ("SSA") denied his claim.  R. 95.  Villafane,

through counsel, requested and obtained review by an administrative law judge ("ALJ"), R. 110-

13; ALJ Edgell held a hearing on May 25, 2011, R. 70.  On June 24, 2011, the ALJ issued a

written opinion denying Villafane's application for benefits.  R. 25-31.  On August 30, 2012, the

---

[1]       The Clerk of the Court is respectfully direct to list the Defendant as listed above.

[2]       Citations to the administrative record, Dkt. 9, are marked "R."

SSA's Appeals Council declined to review the ALJ's decision, adopting it as the final decision of the Commissioner. R. 1.

On October 26, 2012, Villafane initiated this action. Due to an administrative error, the Government did not file its response for nearly eighteen months. On April 30, 2014, Villafane moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure; on July 23, 2014, the Government responded and cross-moved for judgment. Villafane did not respond to the Government's motion. Because substantial evidence supports the Commissioner's final determination and the ALJ did not commit legal error, Villafane's motion is DENIED, and the Commissioner's motion is GRANTED.

## FACTUAL BACKGROUND

Villafane was born in Puerto Rico in 1948; he attended some high school, earned a GED, and attended some college. R. 72, 75. Villafane served in the United States Army during the Vietnam War. He had worked on and off as a carpenter prior to 2002, when he was incarcerated. R. 80. After being released in 2007, Villafane had trouble finding work because of his conviction. *Id.* When he testified in 2011, Villafane reported that he had last worked as a carpenter in late 2008 and early 2009; he testified that he left that job because his hands were in too much pain. R. 77-78; *see also* R. 161.

Villafane complained of two distinct categories of injury – post-traumatic stress disorder ("PTSD") from his service in Vietnam and constant pain in his shoulders, hands, and wrists. Villafane's PTSD was diagnosed in or before 2003; at that time he was receiving treatment for PTSD and depression from the medical personnel at Rockland County Correctional Facility. R. 208-10. The medicine that Villafane received kept him "nice and calm," R. 212, and his drug and alcohol addiction has been in remission since 2003, R. 84, 213, 220, 222. After he was released from jail, in 2007, Villafane was seen by Dr. Teresa Preston (a psychiatrist), among

2

others, at the Veterans Health Administration Hospital ("VA").  R. 331-37.  Dr. Preston recorded

that Villafane had PTSD and polysubstance drug dependence in remission; on August 3, 2007,

she found that Villafane had a Global Assessment of Functioning ("GAF") score of 70.[3]  R. 333.

During that visit Villafane reported that he had stopped taking all medication as of 2005, R. 346,

but that he was "calmer and less irritable," and was ready to live at home with his wife and

children and "do good in society," id.  Dr. Preston diagnosed mild anxiety and minimal

depression.  R. 358.  In September 2007 – at the beginning of Villafane's contested disability –

VA doctors developed a treatment plan for Villafane's PTSD.  R. 331-34.  In order to help

Villafane to manage his mood and to address his anxiety and anger, the VA recommended

individual and group psychotherapy.  R. 334.  During these sessions Villafane "report[ed] feeling

'good.'"  R. 435-36.

    Although he was still doing well immediately before the end of the relevant period, R.

435, by January 31, 2008, Villafane's PTSD had been exacerbated; he was "feeling very

anxious" and had a GAF of 65, R. 431, 433.  Villafane terminated treatment that day.  When he

resumed treatment a year later he was diagnosed with moderate anxiety and moderate to severe

depression.  R. 416.  At that time, Dr. Preston found that his GAF was 60 based on his flat

affect, circumstantial speech and occasional panic attacks.  R. 420.[4]  Nevertheless, Villafane was

---

[3]        "GAF rates overall psychological functioning on a scale of 0-100 that takes into account psychological,
social, and occupational functioning.  A GAF in the range of 61 to 70 indicates 'some mild symptoms (e.g.,
depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g.,
occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful
interpersonal relationships.'" Zabala v. Astrue, 595 F.3d 402, 405 n.1 (2d Cir. 2010) (quoting American Psychiatric
Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), at 34 (4th ed. rev.2000)).  "The
Court notes that the Fifth Edition of the DSM has discarded the use of GAF Scores.  The DSM IV, however, was in
effect at the time of [Villafane's] treatment." Vanterpool v. Colvin, No. 12-CV-8789(VEC)(SN), 2014 WL
1979925, at *2 n.2 (S.D.N.Y. May 15, 2014) (citation omitted).

[4]        "A GAF in the range of 51 to 60 indicates 'moderate symptoms (e.g., flat affect and circumstantial speech,
occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends,
conflicts with peers or co-workers).'" Zabala, 595 F.3d at 406 n.3 (quoting DSM-IV at 34) (alteration omitted).

alert, "well groomed," "articulate[]" and "goal directed."  R. 419.  Dr. Preston prescribed

medication and supportive therapy.  *Id.*

In October 2009 Dr. Preston summarized Villafane's conditions for the New York State

Office of Temporary and Disability Assistance.  R. 292-99.  Dr. Preston's overarching diagnoses

were chronic PTSD and polysubstance dependence in full remission; she noted nightmares,

flashbacks, sleep disturbances, recurrent memories, anxiety, startled reactions, and daily

"worries" among Villafane's symptoms.  R. 293.  She again assigned him a GAF of 60.  R. 295.

Dr. Preston assessed that Villafane was "able to work alone but having problems with others

(avoid people, crowds and public spaces)."  R. 297.  She also wrote that Villafane was "not able

to work due to exacerbation of symptoms and problems with interpersonal relationships."  *Id.*

Two months later in December 2009, state psychologist Dr. M. Marks evaluated Villafane's

mental condition.  Dr. Marks noted anxiety, recurrent and intrusive recollections of a traumatic

experience, R. 306, and assessed Villafane with a mild restriction of activities of daily living,

moderate difficulties in maintaining social functioning and in maintaining concentration,

persistence and pace, and no repeated episodes of decompensation, R. 311.  Dr. Marks found that

while Villafane was "not significantly limited" for most tasks, he was "moderately limited" in

carrying out detailed instructions, maintaining his concentration for prolonged periods,

completing a normal workday without an unreasonable number of rest periods, interacting with

the general public, accepting instructions and criticism from superiors, and responding to

changes in the workplace.  R. 315-16.  Ultimately Dr. Marks noted that "despite a severe

impairment, the claimant retains the capacity to understand and follow directions, sustain a

reasonable pace, relate and respond adequately in a social setting, and adapt to changes."  R. 317.

As to his physical condition, Villafane has adduced significantly less evidence.  He

testified in 2011 that all of his joints, particularly his wrists, starting swelling in 2004.  R. 82.  He

asserted that the prison doctors told him that he might need surgery but sent him for physical

therapy, gave him painkillers, and prescribed Humira and Methatrexate.  R. 82-83.  In April

2007, Villafane was treated for shoulder bursitis, which had been causing him pain since

February 2007.  R. 230-31.  When he saw a VA doctor for his physical ailments in July 2007,

Villafane complained of heartburn and a toenail condition, but the record reflects no complaints

of joint pain.  R. 338-39.  Six months after the period at issue, in June 2008, Villafane was

examined for bilateral wrist pain and masses.  R. 373.  Dr. Doron Ilan of Rivertown

Orthopaedics, PLLC, wrote that Villafane "states the problem has been going on for sometime

[sic] and has been getting worse.  The left one actually hurts more but the right one bothers him

more because he uses this one more for work."  *Id.*  Dr. Ilan believed that Villafane had

"[b]ilateral wrists arthrosis," R. 374, and ordered an MRI, R. 366-67.  The MRI was

inconclusive; the findings were consistent with degenerative osteoarthritis but did not rule out

inflammatory arthritis.  R. 366.

Beginning in February 2009, Villafane sought regular care for the pain in his right hand

and shoulder, which he rated a seven out of ten.  R. 426.  A March 2009 examination by Dr.

Abbey revealed pain in the shoulders, which was diagnosed as tendonitis or bursitis, and

swelling in the wrists.  R. 252.  Villafane reported that over the "last few months [before March

2009] his elbows, knees and shoulders ha[d] been bothering him."  R. 253.  The same report

indicated that Villafane reported that he had experienced a "year and [a] half of swelling in his

wrists," which would include the contested period at the end of 2007, R. 254, but Dr. Abbey's

report specifically noted that Villafane was "a very poor historian."  R. 253.  In September 2009,

Villafane reported to Dr. Abbey that he could not take painkillers during the day and so he had

"major limitation of [the] use of his hands and arms because of pain."  R. 269.  Dr. Abbey

diagnosed "symmetric polyarthritis," "seronegative rheumatoid arthritis vs. other inflammatory

arthritis," and "left shoulder bursitis."  R. 270.  Throughout 2009 and 2010 Villafane also saw

Dr. Oliver Kurucz, a rheumatologist, who injected him with Humira to address possible

rheumatoid arthritis in his wrists.  R. 369-72.

Villafane applied for disability benefits with the help of counsel and was denied at every

step of the process.  After the SSA adopted the ALJ's opinion, making it the final judgment of

the Commissioner, Villafane initiated this appeal.

**DISCUSSION**

When reviewing an appeal from a denial of disability benefits, courts "'conduct a plenary

review of the administrative record to determine if there is substantial evidence, considering the

record as a whole, to support the Commissioner's decision and if the correct legal standards have

been applied.'"  *McIntyre v. Colvin*, --- F.3d ---, No. 13-2886-cv, *slip op.* at 7-8 (2d Cir. July 7,

2014) (quoting *Kohler v. Astrue*, 546 F.3d 260, 264 (2d Cir. 2008)); *see also* 42 U.S.C. § 405(g).

"To be eligible to receive benefits, an applicant must be 'insured for disability insurance

benefits.'"  *Kohler*, 546 F.3d at 265 (quoting 42 U.S.C. § 423(a)(1)(A) and (c)(1)) (other internal

quotation marks and citation omitted).  Here, Villafane must demonstrate that he had a disability

before December 31, 2007, which is the date he was last insured.

"'Disability' is statutorily defined as the 'inability to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment which has lasted

or can be expected to last for a continuous period of not less than 12 months.'"  *Id.* (quoting 42

U.S.C. § 423(d)(1)(A)).  "In evaluating disability claims, the SSA follows a five-step process

mandated by the relevant regulations:

> "First, the Commissioner considers whether the claimant is currently engaged in
> substantial gainful activity. If he is not, the Commissioner next considers whether
> the claimant has a 'severe impairment' which significantly limits his physical or
> mental ability to do basic work activities. If the claimant suffers such an
> impairment, the third inquiry is whether, based solely on medical evidence, the

claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him *per se* disabled.  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform."

*Selian v. Astrue*, 708 F.3d 409, 417-18 (2d Cir. 2013) (*per curiam*) (quoting *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)) (alterations omitted); *see* 20 C.F.R. § 404.1520.

Although his filings are not entirely clear, the Court understands Villafane to be challenging three aspects of the ALJ's opinion.  First, Villafane argues that the ALJ's opinion was not supported by substantial evidence.  Second, he asserts that ALJ did not apply the "treating physician rule."  Finally, Villafane contends that the ALJ erred by not applying post-2007 diagnoses retrospectively to the relevant period.  None of these arguments is persuasive.

## I.    The ALJ's Determination Was Supported by Substantial Evidence

"'Substantial evidence' is evidence that amounts to 'more than a mere scintilla,' and has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *McIntyre*, --- F.3d at ---, *slip op.* at 8 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  In this case the ALJ made two separate findings that Villafane appears to be challenging.  First, the ALJ found that Villafane's pain in his wrists and shoulders did not, during the fall of 2007, rise to the level of a disability under the Act.  R. 28 ("There is no medical evidence of record of any severe physical impairment prior to December 31, 2007, the date last insured.").  Second, the ALJ found that despite Villafane's PTSD, he had the residual functional capacity ("RFC") to perform past relevant work as a carpenter.  R. 29-30.  Both of these findings are supported by substantial evidence.

An ALJ should rule out an impairment as "not severe" under Step Two "only . . . to screen out *de minimis* claims."  *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995); *see also*

*McIntyre*, --- F.3d at ---, *slip op.* at 12.  Still, "'[t]he mere presence of a disease or impairment, or establishing that a person has been diagnosed for a disease or impairment is not, by itself, sufficient to render a condition severe.'"  *Perez v. Colvin*, No. 13-CV-3713(AJP), 2014 WL 2462992, at *12 (S.D.N.Y. June 2, 2014) (quoting *McDowell v. Colvin*, No. 11-CV-1132(NAM/VEB), 2013 WL 1337152, at *6 (N.D.N.Y. Mar. 11, 2013), *report & rec. adopted by* 2013 WL 1337131 (N.D.N.Y. Mar. 29, 2013)).  The ALJ here determined that Villafane's physical infirmities, as they existed prior to December 31, 2007, were *de minimis*.  *See* R. 28. While Villafane had been treated for bursitis of his shoulder in prison, he did not mention any pain in his joints when he underwent a physical examination in July 2007.  R. 338-39.  The evidence in the record that Villafane was in pain *after* December 31, 2007, does not suggest that the cause of the pain constituted a disability during the relevant time period.  *Accord Wagner v. Sec'y of Health and Human Servs.*, 906 F.2d 856, 862 (2d Cir. 1990); *see* Part III, *infra*. Although Villafane testified that his joint pain began in 2004, R. 82, Villafane also testified that he performed relevant work as a carpenter after the time period, stopping in 2009 when his joint pain worsened.  R. 78-79, 82.  Thus, there was substantial evidence to support the ALJ's determination that Villafane had only *de minimis* joint pain during the contested period.

Villafane also challenges the ALJ's determination that he "had the residual functional capacity to perform a full range of work at all exertional levels but without high contact with the public."  R. 29.  Unlike his physical condition, which was largely untreated until 2009 when it worsened to the point where it affected his work, Villafane's PTSD is the subject of several medical reports during the contested period.  These reports indicate that Villafane's PTSD-related anxiety and anger were well under control.  R. 333.  His GAF, assessed by his treating physician, was 70.  R. 436-37; *cf. Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (*per curiam*) (affirming judgment that claimant with a GAF score of 60 was not disabled); *Martinez v.*

*Astrue*, No. 10-CV-9284(PKC), 2012 WL 4761541, at *12-13 (S.D.N.Y. Aug. 1, 2012).  In fact,

Villafane told his doctors that he wanted to "do good in society" and that his focus was on

"get[ting] back to life and not get[ting] in trouble anymore."  R. 346.  Villafane reported that he

was not depressed or symptomatic.  *Id.*  In his first visit *after* the relevant period, on January 31,

2008, Villafane had a GAF of 65 and reported anxiety, but was alert, oriented, cooperative,

articulate, and "goal directed."  R. 433.  This evidence is more than sufficient to support the

ALJ's determination that Villafane's PTSD would not meaningfully inhibit his ability to work

productively, with limitations in his interactions with the public.  R. 29-30; *see also* R. 317.

## II.      The ALJ Properly Applied the Treating Physician Rule

"With respect to 'the nature and severity of a claimant's impairment(s),' 'the SSA

recognizes a 'treating physician' rule of deference to the views of the physician who has engaged

in the primary treatment of the claimant.'"  *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008)

(quoting 20 C.F.R. § 404.1527(d)(2) and *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir.

2003)) (alterations omitted).  Villafane identifies Dr. Preston as the treating physician to whom

the ALJ allegedly accorded insufficient weight.  Villafane Br. at 9-10.  This argument lacks all

merit.  The ALJ specifically referred to Dr. Preston's August 2, 2007 evaluation – the same

evaluation cited by Villafane – in assessing the claimant's RFC.  *See* R. 30.  Dr. Preston's

evaluations revealed that Villafane's GAF was 70 and that he did not have marked symptoms in

August or December 2007.  Villafane reiterates that he was diagnosed with PTSD based on his

combat experiences and that he suffers nightmares and flashbacks.  There is ample evidence to

support these claims, but Villafane does not connect them to the ALJ's determination of his

RFC.  The ALJ credited Dr. Preston's diagnoses but, based on her reports in addition to Dr.

Marks's analysis, found that *despite* his acknowledged conditions, Villafane could perform past

relevant work as a carpenter.  R. 29-30.  This finding is entirely consistent with the treating

physician rule.  "Plaintiff's treating physician offered evidence that Plaintiff was asymptomatic and without any functional limitations.  The ALJ did not reject the treating physician's opinion.  Rather, the ALJ accepted Dr. [Preston]'s opinion—at least to the extent that it indicated an ability to perform [work without public interaction]."  *Infante v. Apfel*, No. 97-CV-7689(LMM), 2001 WL 536930, at *6 (S.D.N.Y. May 21, 2001) (citations omitted); *see also Carvey v. Astrue*, No. 06-CV-737(NAM), 2009 WL 3199215, at *12 (N.D.N.Y. Sept. 30, 2009) (no error where "the ALJ did not reject [the treating physician's] opinion and there is no evidence to suggest  that [the physician] did not adequately describe plaintiff's condition").

### III.   The ALJ Did Not Err in Her Application of Post-Period Diagnoses

Finally, Villafane argues that the ALJ erred by failing to account for diagnoses of his conditions *after* the relevant period as "retrospective diagnoses," relevant under *Wagner*, 906 F.2d 856.  "*Wagner* reversed the Secretary's finding of no disability when no medical opinion in evidence contradicted one doctor's retrospective diagnosis finding a disability."  *Rivera v. Sullivan*, 923 F.2d 964, 968 (2d Cir. 1991).  In fact, the treating physician in *Wagner* "consistently took the position before the Secretary that his patient was disabled," but did not diagnose the cause of the claimant's symptoms until after the period had ended.  *Wagner*, 906 F.2d at 858.  Once the physician diagnosed the cause of the symptoms, he stated unequivocally that it was his "opinion that this patient ha[d] been totally and permanently disabled since [the beginning of the relevant period]."  *Id.* at 859.

This case is nothing like *Wagner*.  Whereas the SSA determination in *Wagner* ignored the treating physician's reports of the claimant's symptoms, the ALJ here specifically credited Dr. Preston's August 2007 examination.  R. 30.  The only report that Dr. Preston issued that could be read "retrospectively" to suggest that Villafane lacked the ability to perform carpentry work is her 2009 report indicating that Villafane was "not able to work due to exacerbation of symptoms

and problems with interpersonal relationships." R. 297. By its own terms, this states that Villafane's symptoms had grown worse (i.e., were exacerbated) after the period in question – a stark contrast to *Wagner*, in which the treating physician explicitly wrote that the symptoms were present from the beginning of the period. 906 F.2d at 859. Moreover, in the same report Dr. Preston noted that Villafane was "able to work alone but having problems with others," R. 297, a problem the ALJ noted in Villafane's RFC assessment, R. 30. Finally, this is not a case in which "no medical opinion in evidence contradict[s] [a] doctor's retrospective diagnosis finding a disability," *Rivera*, 923 F.3d at 968, or "a diagnosis emerge[d] after the close of administrative proceedings that 'sheds considerable new light on the seriousness of a claimant's condition,'" *Lisa v. Sec'y of Dep't of Health and Human Servs.*, 940 F.2d 40, 44 (2d Cir. 1991) (quoting *Tolany v. Heckler*, 756 F.2d 268, 272 (2d Cir. 1985)) (alterations omitted). In fact, applying Dr. Preston's October 2009 findings to 2007 would directly contradict Dr. Preston's contemporaneous notes from August and December 2007, all of which made it clear that Villafane was capable of working at that time. *See, e.g.,* R. 435-39, 330-33.

   Insofar as Villafane intends to argue that his physical impairments precluded his work during the relevant period, this too is unpersuasive. First, there is no evidence that any treating physician has diagnosed Villafane with severe wrist and shoulder problems that began as early as 2007. Some of the possible diagnoses that his doctors have discussed include degenerative conditions that could well have begun during the relevant period but only worsened to the point that Villafane reported pain to his treating physicians after the relevant period. *See, e.g.*, R. 366. Consistent with that notion, Villafane actually performed carpentry work after the relevant period. R. 77-78. Far from asserting that Villafane's condition precluded him from work during the relevant period, Villafane's treating physician suggested that he was not credible with regard to the onset date of his symptoms. R. 253.

The ALJ did not err by finding that Villafane's post-period conditions, if any, did not disable him during the period from September 1, 2007, through December 31, 2007.

## CONCLUSION

For the foregoing reasons, Villafane's motion for judgment on the pleadings is DENIED, Colvin's cross-motion for judgment on the pleadings is GRANTED, and the case is DISMISSED.  The Clerk of the Court is respectfully directed to terminate Dkts. 13, 19, and 21 and to terminate the case.

**SO ORDERED.**

**Date:   August 28, 2014**
           **New York, NY**

**VALERIE CAPRONI**
**United States District Judge**

12